# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of: ) No. 69322-1-I
)
JUNE JOHNSON, ) DIVISION ONE
)
Appellant. ) PUBLISHED OPINION
)
) FILED: February 24, 2014
)

APPELWICK, J. — Johnson was involuntarily committed under Washington's emergent detention statute, RCW 71.05.153. Mental health professionals at Harborview believed that, because of Johnson's mental disorder, she was gravely disabled and presented an imminent risk of serious harm to herself and others. The hospital detained her for an initial 72 hours, then petitioned for another 14 days of involuntary treatment. RCW 71.05.153 does not provide for judicial review of the initial 72 hour emergency detention. Johnson argues that it violated due process to commit her without the opportunity for judicial review of whether she presented an imminent risk of serious harm at the outset of her emergency detention. We affirm.

## FACTS

On August 23, 2012, police transported June Johnson to Psychiatric Emergency Services at Harborview Medical Center after someone at her mother's home called 911. Johnson's mother explained that Johnson said she was going to get her son and she had been crying. However, Johnson's son lives in a foster home. Johnson insisted that a photo of her son was actually her son. She was also extremely upset, yelling, and swearing at her boyfriend and mother.

Designated Mental Health Professional (DMHP) Gail Bonicalzi evaluated Johnson soon after she was brought to the hospital. Bonicalzi noted that Johnson

arrived at Harborview highly disorganized and suffering from bizarre delusions. Johnson disrobed and insisted she was pregnant, even though she was not. She was unable to state how she came to the hospital or where she would go if released. Bonicalzi wrote in her evaluation that Johnson "is gravely disabled demonstrating an imminent risk of harm. She demonstrates a repeated and escalating loss of cognitive and volitional control. She is not receiving such care that is essential for her health and safety."

Advanced Registered Nurse Practitioner (ARNP) Angela Buxton also assessed Johnson at Harborview. Buxton explained that Johnson has been diagnosed with bipolar and schizoaffective disorders, but has a history of very poor compliance with outpatient psychiatric treatment. Buxton wrote that Johnson was visibly distraught, extremely agitated, crying, and having difficulty processing any information. Johnson admitted to having racing thoughts, feeling stressed, and not sleeping for several days, but insisted that she did not need psychiatric medication.

Buxton observed Johnson yelling and swearing at other patients and hospital staff. Johnson was placed in safety restraints, because of her "impulsive and unpredictable, hostile behavior." Buxton saw Johnson speaking to herself as if speaking with another person, though no one else was in the room. Buxton expressed concern that Johnson was disrobing and refusing to put her clothes back on, which would make her extremely vulnerable if released into the community. Johnson also had extremely low potassium, which can lead to cardiac arrhythmia and death. Buxton believed that Johnson was gravely disabled and a danger to others.

DMHP Bonicalzi sought an initial 72 hour emergency detention of Johnson under RCW 71.05.153(1) and (2)(a), Washington's emergent detention statute. The petition stated, "Investigation and evaluation indicate that you present an imminent likelihood of serious harm to yourself or others, or that you are gravely disabled."

On August 27, 2012, after Johnson's initial detention, Harborview petitioned for an additional 14 days of involuntary treatment. Johnson, through her counsel, moved to dismiss the petition for lack of imminence. Johnson argued that there was no evidence that her health and safety were ever in imminent risk of danger, which was necessary to justify her initial 72 hour detention. She sought a hearing before a judge on whether she was lawfully detained.

On August 28 and 29, 2012, the trial court held a commitment hearing on the State's petition for further treatment. Johnson's counsel argued that due process requires judicial review to validate the initial 72 hour detention based on imminence. The court could not find any authority for its ability to review imminence, and denied Johnson's motion. The court explained,

> So I don't see any procedure for imminence hearings. Certainly the legislature could build that into the statute if they choose to do that. The Supreme Court can also say there is an imminence hearing and at that point tell us how to conduct those. But at this time I will decline to conduct an imminence hearing and find that even if there was a violation of the imminence requirement, this isn't the appropriate forum.

The court entered written findings of fact and conclusions of law to that effect.

Three witnesses testified at the hearing: ARNP Buxton, Johnson's mother, and Allison Osborn, a licensed clinical psychologist who evaluated Johnson on August 26 and 28. Based on this testimony, the court ruled that the State established by a

preponderance of the evidence that Johnson was gravely disabled, and granted the 14 day involuntary treatment. Johnson appeals.

## DISCUSSION

Johnson assigns error to the trial court's refusal to decide whether her commitment was justified at its inception. She argues that it violates due process to involuntarily commit a person under RCW 71.05.153 without the opportunity for a judge to review whether that person presents an imminent risk of serious harm.[1] U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. We review alleged due process violations de novo. Post v. City of Tacoma, 167 Wn.2d 300, 308, 217 P.3d 1179 (2009).

### I. Mootness

Johnson argues that even though she is no longer detained, her case is not moot, because it presents an issue of substantial importance. The State also requests that we decide the issue on the merits.

This case is technically moot, because Johnson's detention has long since ended. In re Det. of Swanson, 115 Wn.2d 21, 24, 782 P.2d 962, 804 P.2d 1 (1990). However, an appellate court may decide a moot case if it involves an issue of continuing and substantial public interest. Id. In deciding to review a moot issue, we must consider: (1) the public or private nature of the issue; (2) the desirability of an

---

[1] At oral argument, Johnson's counsel characterized her due process challenge as both procedural and substantive. Substantive due process protects against arbitrary and capricious government action when the decision to take action is pursuant to constitutionally adequate procedures. Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 218-19, 143 P.3d 571 (2006). State interference with a fundamental right is subject to strict scrutiny. Id. at 220. Johnson makes no argument to this effect in her brief. And, we believe her argument is most properly characterized as a procedural due process challenge. Therefore, we do not consider substantive due process.

authoritative determination that will provide future guidance to public officers; and (3) the likelihood that the issue will recur. Id. at 24-25. The Washington Supreme Court has recognized that the need to clarify the statutory scheme governing civil commitment is such an issue. Id. at 25; see also In re Det. of C.W., 147 Wn.2d 259, 270, 53 P.3d 979 (2002). The fact that both parties request review here indicates that there is need for guidance. Swanson, 115 Wn.2d at 25. Clearly, the issue is likely to recur. Thus, we resolve this case on the merits.

II.   Due Process Challenge

Johnson argues that she was denied due process of law when she was detained without any ability to challenge whether there was a sufficiently credible claim that she presented an imminent risk of serious harm to herself or others. Johnson contends that she was entitled to immediate judicial document review of the lawfulness of her initial 72 hour detention. She argues that the absence of imminence in her initial detention should have entitled her to release.

A. Emergency Detention Statutory Requirements

Washington's involuntary commitment statute, chapter 71.05 RCW, provides two methods for the State to detain an individual for 72 hours based on a mental disorder. Under RCW 71.05.153, at issue here, a DMHP may initiate an emergency 72 hour detention when there is imminent danger or risk of harm. Under RCW 71.05.150, a DMHP may initiate a nonemergency detention through a summons procedure.

The legislature's stated intent for the chapter is:

> (1) To prevent inappropriate, indefinite commitment of mentally disordered persons and to eliminate legal disabilities that arise from such commitment;

5

(2) To provide prompt evaluation and timely and appropriate treatment of persons with serious mental disorders;

(3) To safeguard individual rights;

(4) To provide continuity of care for persons with serious mental disorders;

(5) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures;

(6) To encourage, whenever appropriate, that services be provided within the community;

(7) To protect the public safety.

RCW 71.05.010.

Emergency involuntary detention requires a DMHP or police officer to find, after investigation, that there is credible and reliable information that the "person is suffering from a mental disorder and presents an <u>imminent likelihood of serious harm</u> or is in <u>imminent danger because of being gravely disabled</u>." RCW 71.05.153(1), (2)(b) (emphasis added). "Gravely disabled" means,

> [A] condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(17). Harm is "imminent" when it can "occur at any moment or near at hand." RCW 71.05.020(20).

Within three hours of arrival at a mental health facility, the individual must be examined by a mental health professional. RCW 71.05.153(4). Within 12 hours of arrival, the DMHP must determine whether the individual meets the emergency

6

detention criteria. RCW 71.05.153(4). If so, the mental health facility may detain the individual for 72 hours. RCW 71.05.210. Further detention requires the State to file a petition for an additional 14 days of involuntary treatment. RCW 71.05.210, .230.

Under RCW 71.05.150, the State may initiate a 72 hour nonemergency detention through a summons procedure that requires judicial oversight at the outset. A mental health professional may seek a judicial order authorizing detention of a person who, "as a result of a mental disorder: (i) Presents a likelihood of serious harm; or (ii) is gravely disabled." RCW 71.05.150(1). Before detaining the person at a treatment facility, a superior court judge must be satisfied that (1) there is probable cause to support the petition and (2) the person refused or failed to accept appropriate evaluation and treatment voluntarily. RCW 71.05.150(2)(a).

There are two key differences between the emergent and nonemergent detention statutes. First, emergency detention requires imminence: an imminent likelihood of serious harm or imminent danger because of grave disability. RCW 71.05.153(1), (2)(b). In contrast, nonemergency detention requires only a likelihood of serious harm or grave disability. RCW 71.05.150(1). In Harris, the Washington Supreme Court recognized that omission of imminence in the nonemergency detention statute was purposeful.[2] In re Harris, 98 Wn.2d 276, 282, 654 P.2d 109 (1982). Second, an initial 72 hour nonemergency detention must be authorized by a judge. RCW 71.05.150(2)(a). There is no such judicial oversight for an initial 72 hour emergency detention. See RCW 71.05.153.

---

[2] The legislature amended the involuntary commitment statute since Harris, rewriting the nonemergency detention provision and recodifying emergency detention. LAWS OF 2007, ch. 375, §§ 7-8; see also former RCW 71.05.150(4)(b) (1998).

The legislature clearly intended to omit judicial review from the emergency detention procedure. The duty of this court is to give purpose and effect to the statute, so long as it passes constitutional muster. In re Det. of Jones, 149 Wn. App. 16, 24, 201 P.3d 1066 (2009). Therefore, our review focuses on whether the procedures provided under RCW 71.05.153 satisfy due process.

## B. Procedural Due Process

Involuntary commitment for mental disorders constitutes a significant deprivation of liberty that requires due process protections. C.W., 147 Wn.2d at 277. Procedural due process prohibits the State from depriving an individual of protected liberty interests without appropriate procedural safeguards. In re Pers. Restraint of Bush, 164 Wn.2d 697, 704, 193 P.3d 103 (2008). At its core, procedural due process is a right to be meaningfully heard. In re Det. of Stout, 159 Wn.2d 357, 370, 150 P.3d 86 (2007). But, its minimum requirements depend on what is fair in a particular context. Id.

To determine the adequacy of procedures provided, we must balance three factors: (1) the private interest affected; (2) the risk of erroneous deprivation of that interest through existing procedures and the probable value, if any, of additional procedural safeguards; and (3) the governmental interest, including costs and administrative burdens of additional procedures. Harris, 98 Wn.2d at 285 (relying on Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). Washington courts have imposed additional procedural safeguards on civil commitment statutes in order to protect affected persons against abuses. See, e.g., id. at 277 (requiring judicial finding of "probable dangerousness" before detention in nonemergency situations).

Here, the private interest at stake is significant: the detainee's liberty. In re Det. of V.B., 104 Wn. App. 953, 964, 19 P.3d 1062 (2001). The United States Supreme Court has described involuntary commitment as a "'massive curtailment of liberty.'" In re Det. of LaBelle, 107 Wn.2d 196, 201, 728 P.2d 138 (1986) (quoting Humphrey v. Cady, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972)).

However, several procedural safeguards minimize the risk of erroneous deprivation of the detainee's liberty. As discussed above, the individual must be examined by a mental health professional within three hours of arrival at the mental health facility. RCW 71.05.153(4). Then, within 12 hours of arrival, a DMHP must determine whether the individual presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled. Id. The DMHP can make this determination only "after investigation and evaluation of the specific facts alleged and of the reliability and credibility of the person or persons providing the information if any." RCW 71.05.153(1). The DMHP must also evaluate the individual under RCW 71.05.150 for a likelihood of serious harm or grave disability that does not meet the imminence standard for emergency detention. RCW 71.05.156.

The individual must be further examined and evaluated by at least two medical professionals within 24 hours: either by (1) a licensed physician and a mental health professional, (2) an ARNP and a mental health professional, or (3) a licensed physician and a psychiatric ARNP. RCW 71.05.210. The civil commitment statute requires that these providers act in good faith. RCW 71.05.500. They can be held civilly liable for knowingly, willfully, or through gross negligence violating the provisions of the chapter and detaining a person for more than the allowable number of days. RCW 71.05.510;

see also RCW 71.05.120. All these evaluations guard against holding detainees who are not in imminent danger of harming themselves or others. The imminence requirement reflects a valid constitutional concern for establishing a high standard of danger when the potential deprivation of liberty is great. Harris, 98 Wn.2d at 283.

The final factor—governmental interest—also weighs heavily in the State's favor. The State's interest at stake is preeminent: protecting the public and caring for those in need of immediate mental health treatment. Nonemergency detention requires judicial review at the outset. However, the State's interest is more significant in emergency detentions, where several mental health professionals believe the individual poses imminent danger to herself or others. And, in the context of involuntary commitment, we must consider the risk of erroneous release. V.B., 104 Wn. App. at 965. With emergency detentions, the risk of harm and risk of erroneous release are too great.

In V.B., the appellate court considered whether due process requires the State to prove at a 14 day commitment hearing that the initial detaining officer had reasonable cause to believe the detainee presented an imminent likelihood of serious harm or was gravely disabled at the time of detention. Id. at 955. There, a police officer delivered V.B. to the hospital for a mental health evaluation, because V.B. was allegedly threatening other tenants in her building with a knife. Id. at 956. Several mental health professionals believed V.B. presented an imminent likelihood of serious harm to others and was gravely disabled. Id. She was detained for an initial 72 hours under the former

10

emergency detention statute.[3] Id. at 956, 961. The State subsequently petitioned to hold V.B. for an additional 14 day involuntary treatment. Id. at 956.

The superior court heard the petition the following day. Id. at 957. However, the State was unable to locate the detaining officer to testify, so only the treating mental health professionals testified at the hearing. Id. V.B.'s counsel moved to dismiss, arguing that without the officer's testimony, the State failed to show that the officer had reasonable cause to detain V.B. Id. at 958.

On appeal, the court held that failing to present the officer's testimony did not violate due process. Id. at 965. Though the detainee's liberty interest is great, the involuntary commitment statute provides several procedural safeguards to protect from erroneous deprivation of that interest. Id. And, releasing a detainee who meets the criteria for detention merely because the officer is unavailable puts the public and the detainee at unnecessary risk. Id. In essence, the V.B. court held that the State does not need to prove that imminence existed at the outset of a 72 hour emergency detention in order to proceed with an otherwise necessary 14 day involuntary treatment.

Johnson distinguishes V.B. on the basis that it was an after the fact request for review. Johnson is requesting immediate judicial document review of the lawfulness of her initial 72 hour detention. However, we do not find such a distinction meaningful enough to warrant a different result.

---

[3] Former RCW 71.05.150(4)(b) (1998). The emergency detention provision at issue in V.B., though recodified, is identical to the current provision. Compare id., with RCW 71.05.153(2)(b). The remainder of the former emergency detention statute is also substantially similar to the current statute. Compare former RCW 71.05.150(2)-(5) (1998), with RCW 71.05.153.

We recognize that the detainee's liberty interest here is significant. However, procedures in the emergency detention statute provide adequate protection against erroneous detention. The State also has a paramount interest in public safety and caring for those in need of immediate mental health treatment. This interest outweighs any minimal enhancement to due process protections that might be gained by requiring judicial document review of the initial 72 hour detention. We hold that the emergency detention statutory scheme does not violate procedural due process.

The statute does not provide for judicial review of imminence. It need not. The procedures provided for under the emergency detention statute were fully complied with in Johnson's case. She does not allege otherwise. Therefore, the trial court properly refused to review whether the State sufficiently alleged that Johnson presented an imminent risk of harm at the outset of her detention. The additional 14 day involuntary treatment was properly ordered.

We affirm.

Appelwick, J.

WE CONCUR:

Dwyer, J.                    Becker, J.